1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| **Equal Employment Opportunity Commission,** | ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| **Peabody Western Coal Company,** | ) ) | **2:01-cv-01050 JWS** |
| Defendant, | ) ) | |
| and | ) ) | |
| **Navajo Nation,** | ) ) | **ORDER AND OPINION** |
| Rule 19 Defendant. | ) ) ) | |
| **Peabody Western Coal Company,** | ) ) | **[Re:  Motions at dockets 243 & 251]** |
| Third-Party Plaintiff, | ) ) | |
| vs. | ) ) | |
| **Larry J. Echo Hawk, in his official capacity as Assistant Secretary for Indian Affairs of the United States of America, and Kenneth L. Salazar, in his official capacity as Secretary of the Interior of the United States of America,** | ) ) ) ) ) ) ) | |
| Third-Party Defendants. | ) ) | |

Peabody Western Coal Company,                    )
                                                 )
                Counter-claimant,                )
                                                 )
        vs.                                      )
                                                 )
P. David Lopez, in his official capacity         )
as General Counsel of the Equal                  )
Employment Opportunity Commission,               )
and Jacqueline A. Berrien, in her official       )
capacity as Chair of the Equal                   )
Employment Opportunity Commission                )
                                                 )
                Counter-defendants.              )
_____ )

## I.  MOTIONS PRESENTED

At docket 243, third-party defendants, Messrs. Echo Hawk and Salazar, in their

official capacities as officers of the United States Department of the Interior

(collectively, "the Secretary" or "DOI"), filed a motion for summary judgment as to the

third-party claims filed against them by defendant Peabody Western Coal Company

("Peabody").  In the motion, DOI argues that the court should dispose of Peabody's

third-party complaint for two procedural reasons: (1) DOI is not an appropriate third-

party defendant under Rule 14; and (2) even if the complaint were properly before the

court, it fails to allege any reviewable action under the Administrative Procedure Act

("APA").  It also argues that, regardless of the flaws in the third-party complaint,

summary judgment in its favor is warranted because Peabody is not liable to plaintiff

Equal Employment Opportunity Commission ("EEOC") on the underlying claims brought

against Peabody pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII").  It

argues that the allegations against Peabody fall outside the scope of Title VII because

Peabody's tribe-specific employment preference, which is the basis of EEOC's

complaint, but is also required under Peabody's DOI-approved leases with the Navajo

Nation, is a lawful political classification and is not a form of national origin

discrimination.

At docket 253, EEOC filed its response to DOI's summary judgment motion.  It

has no response to DOI's procedural arguments against Peabody's third-party

complaint, but it opposes DOI's alternative request for summary judgment on the

underlying Title VII claims against Peabody.  EEOC asserts that Title VII is applicable

and prohibits discrimination based upon tribal affiliation.

At docket 255, Peabody filed its response to DOI's motion for summary

judgment.  In the response, Peabody opposes DOI's procedural arguments, but agrees

with its assertion that Peabody is not liable to EEOC on the underlying Title VII claims

and, to the extent necessary, designates that portion of its response as a motion for

summary judgment on EEOC's Title VII claims.

DOI's reply to both Peabody's procedural arguments and EEOC's substantive

arguments was filed at docket 264.

Rule 19 defendant Navajo Nation ("the Navajo Nation" or "the Nation"), filed a

response to DOI's motion as well.  It was filed at docket 251.  In that response, the

Nation concurs with DOI's argument that Peabody is not liable to the EEOC on the

underlying Title VII claims.  Therefore, in the response at docket 251, the Nation also

renews its motion to dismiss or, alternatively, moves for summary judgment on the

merits of the underlying Title VII claim against Peabody.  It agrees with DOI that the

-3-

tribal preference required by Peabody's leases is a political classification and not a form of national origin discrimination prohibited by Title VII.  It also asserts that Section 3 of the Rehabilitation Act provides an additional reason to conclude that Title VII is not applicable to the tribal preference at issue in this case.  Alternatively, it asserts that even if Title VII is applicable, dismissal of EEOC's underlying claims is warranted because tribal employment preferences by definition are not actually a form of national origin discrimination and because the exemption set forth in § 703(I) of Title VII is applicable.

At docket 262, EEOC filed its response to the Nation's renewed motion to dismiss or for summary judgment, as well as to Peabody's arguments in favor of summary judgment asserted in docket 255.  EEOC's arguments in the filing at docket 262 are in many respects duplicative of the ones raised in its filing at docket 253, but EEOC also addresses the additional arguments made by the Nation and Peabody in favor of summary judgment on the merits that were not made by DOI. Both the Nation and Peabody filed reply documents to EEOC's response: the Nation's is located at docket 265, and Peabody's is located at docket 266.

Oral argument was heard on October 11, 2012.

## II.  BACKGROUND

**A. Factual Background**

Peabody mines coal in northeastern Arizona on trust lands on the Navajo and Hopi reservations pursuant to lease agreements with the respective tribes.  At issue in this case are two leases that Peabody's predecessor-in-interest, Sentry Royalty

Company, entered into with the Nation: (1) a 1964 lease (referred to as the 8580 lease) that permits Peabody to mine on the Navajo reservation;[1] and (2) a 1966 lease (referred to as the 9910 lease) that permits Peabody to mine on the Navajo portion of land jointly used by the Navajo and Hopi tribes.[2]

Both leases contain provisions that require Peabody to give Navajo Indians an employment preference.  The 8580 lease states that Peabody "agrees to employ Navajo Indians when available in all positions for which, in the judgment of [Peabody], they are qualified," and that Peabody "shall make a special effort to work Navajo Indians into skilled, technical and other higher jobs in connection with [Peabody's] operations under this lease."[3]  The 9910 lease contains an almost identical provision, except that it gives Peabody an option to extend the preference to Hopi Indians as well.[4]

Since 1985 a Navajo Nation tribal ordinance has required employers doing business on the Navajo Nation reservation to give employment preference to Navajo members.[5]  As a result, employment preference provisions are standard terms in leases within the Navajo Nation's jurisdiction.  According to the Nation, as of 2005, there were

---

[1]Doc. 243, Ex.1.

[2]Doc. 243, Ex. 2.  Peabody also operates pursuant to a lease with the Hopi tribe for the Hopi portion of the land jointly used by the Navajo and Hopi tribes. *See* Doc. 256, Ex. 1 at p. 72.  That lease is not relevant to the issues raised in the summary judgment motions.

[3]Doc. 243, Ex. 1 at p. 14.

[4]Doc. 243, Ex. 2 at p. 16.

[5]Doc. 252, Ex. 1, The Navajo Preference in Employment Act, 15 N.N.C. §§ 601-619 (2005).

326 current or recently expired business leases on tribal lands that contain similar employment preference provisions for Navajo job applicants, and all of these leases have been approved by the DOI's Bureau of Indian Affairs.[6]  The Nation has entered into at least two lease agreements that require the lessee to maintain a tribal employment preference, but only to the extent the preference is not in derogation of federal law.[7]

The United States Department of the Interior ("DOI") is linked to both the implementation and enforcement of the two Peabody mining leases at issue.  In accordance with the Indian Mineral Leasing Act of 1938 ("IMLA"), DOI approved both mining leases, including subsequent amendments thereto.[8]  Based on the declaration and testimony of Former Secretary of the Interior Stewart Udall, who served as Secretary during the period the leases were implemented, the DOI not only approved the leases but actually drafted them.[9]  The Nation negotiated for the inclusion of the tribe-specific hiring preference and, pursuant to its trust obligations toward the Nation, DOI required the inclusion of the Navajo employment preference provisions.[10]  Both leases provide that the Secretary and the Nation have the authority to cancel the leases

---

[6]Doc. 89 (Nation's original Motion to Dismiss), Ex. 2.

[7]Doc. 254, Ex. 7 at NN 7 and 151-52.

[8]*E.E.O.C. v. Peabody Western Coal Co.*, 400 F.3d 774, 776 (9th Cir. 2005) (*Peabody I*) (citing 25 U.S.C. § § 396a, 396e).

[9]Doc. 89, Ex. 1 at ¶ 7; Doc. 256, Ex. 3 at p. 7 (Deposition of Stewart Lee Udall, p. 55, lines 2-6); *E.E.O.C. v. Peabody Western Coal Co.*, 610 F.3d 1070, 1075 (9th Cir. 2010) (*Peabody II*).

[10]Doc. 89, Ex. 1 at  ¶¶ 4-7; Doc. 119, Ex. 1 at pp. 18-21 (Deposition of Stewart Lee Udall, pp. 49-64).

in the event Peabody violates any terms.[11]   The Secretary must approve any

amendments to the leases.[12]   Amendments to Lease 8580 and Lease 9910 were

approved by the Secretary as recently as December 9, 2011, but no changes were

made to the employment preference provision in either lease even though this lawsuit

was long underway.[13]

DOI has approved mining leases with tribe-specific employment preferences like

the ones at issue in this case since before the passage of Title VII.[14]   Furthermore, DOI

has form mining contracts that contain tribe-specific employment preferences.[15]

**B. Procedural History**

In June of 2001, EEOC filed its complaint against Peabody asserting that

Peabody unlawfully discriminated on the basis of national origin in violation of Title VII

of the Civil Rights Act.   EEOC alleges that Peabody refused to hire non-Navajo Indians,

specifically two members of the Hopi Nation and one member of the Otoe tribe, as well

---

[11]Doc. 243, Ex. 1 at p. 13; Doc. 243, Ex. 2 at pp. 14-15.

[12]*Peabody II*, 610 F.3d at 1075.

[13]Doc. 243, Ex. 3.

[14]Doc. 256, Exs. 4-7.

[15]Doc. 256, Ex. 2; Doc. 256, Ex. 8.  The EEOC challenges the form contracts on the basis of authentication and hearsay.  The court concludes that the forms in Exhibit 2 are self-authenticating under Rule 902(5) of the Federal Rules of Evidence as a book or publication purporting to be issued by a public authority or under Rule 901(b)(1) because of the authenticating affidavit attached to the exhibit.   While a closer call, the court concludes that the form in Exhibit 8 is also self-authenticating under Rule 902(5).  Furthermore, the forms are not hearsay; they are not introduced to prove the truth of the statements in the forms, but instead for the purpose of providing notice that the forms contain tribal preferences.  *See Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1164 (9th Cir. 2009) ("If the significance of an offered statement lies solely in the fact that it was made . . . the statement is not hearsay.").

as other unspecified non-Navajo Indians, for positions in which they were otherwise qualified.  It alleges that such conduct is in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), which prohibits employers from discrimination on the basis of national origin. Peabody asserted as a defense in its answer, among other things, that the DOI-approved mining leases require that it implement a hiring preference in favor of Navajos, and thus, the hiring preference is not a form of unlawful discrimination.[16]

There is no need to recount the entire procedural history prior to the most recent appellate court decision in this order, because the parties are familiar with it, and other readers can inform themselves by reading the prior circuit court decisions.[17]  Suffice it to say, after the Ninth Circuit's first remand, EEOC filed an amended complaint adding the Nation as a Rule 19 defendant, and after the Ninth Circuit's second remand, EEOC filed a Second Amended Complaint dropping its claim for damages against Peabody.[18]  The principal relief sought by EEOC in its Second Amended complaint is an injunction enjoining Peabody from engaging in discrimination on the basis of national origin.  The Second Amended Complaint also seeks related relief in the form of an order requiring Peabody to provide equal opportunities for non-Navajo Native Americans "which eradicate the effects of its past and present unlawful employment practices" and requiring Peabody to comply with record keeping provisions of Title VII.

---

[16]Doc. 185 at ¶¶ 16-18.

[17]*E.E.O.C. v. Peabody Western Coal Co.*, 400 F.3d 774 (9th Cir. 2005) (*Peabody I*) and *E.E.O.C. v. Peabody Western Coal Co.*, 610 F.3d 1070 (9th Cir. 2010) (*Peabody II*).

[18]Amended Complaint, doc. 67; Second Amended Complaint, doc. 170.

Navajo Nation and Peabody separately answered the Second Amended Complaint.[19]  The case was then stayed while Navajo Nation pursued a petition for *certiorari* in the Supreme Court.  After the petition was denied by the Supreme Court, Peabody filed a third-party complaint against DOI, as well as a counterclaim against EEOC.[20]

DOI's motion for summary judgment at docket 243 as to Peabody's third-party complaint followed.  As stated above, DOI requests that Peabody's Rule 14 claims against it be dismissed for procedural reasons or, alternatively, because Peabody is not liable to EEOC for the underlying Title VII claims.  The Nation's response at docket 251 also reasserts its argument that Peabody is not liable to EEOC for the underlying Title VII claims and asks that those claims be dismissed or for summary judgment in the defendants' favor.  Peabody also indicated in its response to the motion at docket 243 that it is requesting summary judgment on the underlying claims.

### III. STANDARD OF REVIEW

DOI has moved for summary judgment, and Peabody has indicated that it believes summary judgment is appropriate.  The Nation has renewed its motion to dismiss and only alternatively asks for summary judgment, but because the court will consider extrinsic evidence submitted by the parties, the Nation's motion must be treated as one for summary judgment under Rule 56 and not a motion to dismiss for

---

[19]Docs. 184 and 185.

[20]Doc. 195.  An identical complaint, save for the absence of a completed certificate of service, was filed earlier the same day at docket 194.

failure to state a claim.[21] Given that all parties have submitted additional materials, they have reason to know that the court will consider matters outside the pleadings and have had time to develop facts in support of or in opposition to the motion.[22] Thus, the summary judgment standards of review apply.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[23] The materiality requirement ensures that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[24] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[25] In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.[26] The reviewing court may not weigh evidence or

---

[21]Fed. R. Civ. P. 12(d); *see also Edwards v. Wells Fargo & Co.*, 606 F.3d 555, 556 (9th Cir 2010);

[22]*See Grove v. Mead School Dist. No. 354*, 753 F.2d 1528, 1532 (9th Cir. 1985) (noting that if a motion to dismiss is treated as a motion for summary judgment because of reference to extrinsic evidence, the parties must have notice and an opportunity to develop facts related to the motion)

[23]Fed. R. Civ. P. 56(a).

[24]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[25]*Id.*

[26]*Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000).

-10-

assess the credibility of witnesses.[27]   The burden of persuasion is on the moving

party.[28]

## IV.  DISCUSSION

### A. DOI's Rule 14 and APA Arguments

The Secretary was brought in as a third-party defendant by Peabody under

Rule 14 after the Ninth Circuit's most recent ruling in this case, *Peabody II*.  In

*Peabody II* the court held that the Secretary is a required party to this case under

Rule 19(a), but that joining him was not feasible.  It went on to hold, however, that

Peabody and the Nation could nonetheless bring a third-party claim against the

Secretary for prospective relief under Rule 14, and therefore, EEOC's injunctive claims

against Peabody could proceed.

Despite the holding in *Peabody II*, DOI argues that the Ninth Circuit did not

foreclose the district court's consideration of whether impleader of the Secretary under

Rule 14 is actually appropriate.  It asks the court to reopen the issue and conclude that

impleader of the Secretary is not appropriate or, in the alternative, that Peabody fails to

allege a valid claim under the APA.  The court declines to do so.  It is obligated to follow

the appellate court's decision on the issue of the Secretary's impleader.  As the

appellate court stated, "we conclude that prospective relief in the form of an injunction

or declaratory judgment is available in a Rule 14(a) impleader against the Secretary."

Furthermore, this litigation has been pending since 2001, and any further review related

---

[27]*Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[28]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

-11-

to the correct parties to be included in this case and how the parties are to be included would needlessly prolong a decision on the primary issue—whether the tribe-specific preference in Peabody's mining leases falls within the scope of Title VII.  The court has now heard from all involved parties regarding this issue.  It is time to resolve it.

**B. Scope of Title VII**

1. Deference

EEOC urges the court to focus on the underlying allegation at issue in this case: Peabody, a non-Indian employer, engages in national origin discrimination when it refuses to hire non-Navajo Native Americans in violation of Title VII.  It argues that, because Title VII is implicated, the court should defer to its interpretation of whether Peabody's preference is national origin discrimination under Title VII.  But DOI's motion raises a preliminary question specific to the facts of this case; namely, does the fact that the preference is required pursuant to an IMLA lease drafted and approved by DOI change the analysis?  DOI suggests that the leases are a product of the unique relationship between the federal government and the quasi-sovereign Nation, and thus the preference contained in the leases is not unlawful national origin discrimination, but rather a type of political classification not covered by Title VII.

The proper characterization of a DOI-approved lease relating to government lands that are held in trust for the Nation certainly involves an examination of Indian law and affairs.  The management of Indian affairs is within the specific province of the DOI.  The Secretary is charged with the management of all Indian affairs and of all matters

arising out of Indian relations[29] and has "plenary administrative authority in discharging the federal government's trust obligations to Indians."[30]  The Secretary may prescribe such regulations as he thinks fit for carrying into effect the various provisions of any act relating to Indian affairs.[31]  Therefore, while EEOC is entitled to deference regarding Title VII and its obligations thereunder, DOI is entitled to deference in construing the relationship between the federal government and the Nation, and in construing the terms of a DOI drafted and approved IMLA lease.[32]  "[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'"[33]

   2. *Dawavendewa I*

   DOI essentially asserts that the involvement of the IMLA mining leases and the DOI's role in establishing these leases causes the tribe-specific preference at issue to be considered a political classification instead of a form of discrimination.  It does not assert that tribe-specific preferences can never amount to national origin discrimination and be the subject of a Title VII action.  That argument clearly would be barred under

---

[29]25 U.S.C. §2

[30]*United States v. Eberhardt*, 789 F.2d 1354, 1359 (9th Cir. 1986).

[31]25 U.S.C. § 9.

[32] *United States v. Mead Corp.*, 533 U.S. 218, 226-28 (2001) (discussing the range of deference afforded an agency's actions as related to a statutory scheme it is entrusted to administer).

[33]*Bragdon v. Abbott*, 524 U.S. 624, 642 (1998) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 139-40 (1944)).

the Ninth Circuit's holding in *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.* (*Dawavendewa I*).[34]

In *Dawavendewa I*, the court held that discrimination on the basis of tribal affiliation can give rise to a national origin claim under Title VII.  At issue in that case was the employer's argument that all preferences based on membership in a tribe are necessarily political preferences and not national origin discrimination under Title VII.  The court rejected that argument.  The facts recited in that case indicate that the employer leased lands from the Navajo Nation and was required to extend an employment preference to Navajo Nation members.[35]  The presence of these facts in *Dawavendewa I*, on first glance, would suggest Peabody's preference is similarly situated.  However, as the Solicitor General pointed out on behalf of the United States Government generally and the EEOC particularly in an amicus brief to the Supreme Court arguing against *certiorari* in the *Dawavendewa I* case, the Court of Appeals did not consider the suit on the merits, nor did it consider whether any legal justification related to DOI's management over Indian affairs excused the preference.  The employer did not raise any such arguments, and neither the DOI nor the Nation were parties to the case to provide their take on the validity of such preferences contained in DOI-approved leases.  The court therefore left open the question of whether a tribal

---

[34]154 F.3d 1117 (1998).

[35]*Id.* at 1118.

-14-

employment preference of the sort at issue here could be deemed lawful discrimination based on a political classification.[36]

### 3.   Special Status of the Nation

Whether Peabody's Navajo-specific employment preference is a political classification requires an examination of the status of Indian tribes in general and their relationship to the federal government.  Indian tribes are unique, quasi-sovereign entities, each with a special relationship to the federal government.  "Originally the Indian tribes were separate nations within what is now the United States.  Through conquest and treaties they were induced to give up complete independence and the right to go to war in exchange for federal protection, aid, and grants of land."[37]  As a result, Congress has plenary power over Indian affairs.[38]  However, tribes retain many inherent aspects of sovereignty not withdrawn by treaties or related statutes.[39]  Tribes also possess some aspects of sovereignty that have been delegated back to them by Congress in an attempt to promote tribal self-governance, both politically and

---

[36]The Solicitor General, representing the position of the United States, specifically the EEOC, has noted the limited holding in *Dawavendewa I* to the Supreme Court on three separate occasions: (1) Br. for the United States as Amicus Curiae, *Salt River Project Agric. Improvement & Power Dist. v. Dawavendewa,* No. 98-1628 (Doc. 264-2, Ex. 15); (2) Br. for Fed. Resp., *Peabody W. Coal Co. v. EEOC,* No. 05-353 (Doc. 264-1, Ex 14); (3) Br. Fed. Resp., *Navajo Nation v. EEOC,* 10-1981 (Doc. 243, Ex. 13).  "The court of appeals did not address the questions whether an on-reservation employer's preference for members of a particular Tribe in conformity with an ordinance of that Tribe (or the terms of a lease of the trust property of that Tribe) should be viewed as a political classification . . . ." Doc. 264-2, Ex. 15 at p. 13.

[37]*Williams v. Lee*, 358 U.S. 217, 218 (1959).

[38]*Morton v. Mancari,* 417 U.S. 535, 551-52 (1974).

[39]*United States v. Wheeler*, 435 U.S. 313, 323 (1978).

economically.[40]  As part of these retained or delegated sovereign powers, Indian tribes

maintain sovereignty over their members, territory, and internal affairs.[41]  They have the

ability to exclude nonmembers from their reservations.[42]  They even have the power to

exercise some forms of civil jurisdiction over non-Indians on their reservations.  For

example, Indian tribes have the power to "regulate, through taxation, licensing, or other

means, the activities of nonmembers who enter consensual relationships with the tribe

or its members, through commercial dealing, contracts, leases, or other

arrangements."[43]

   The Nation itself has a distinct relationship with the federal government.  There

are two treaties that govern the relationship between the United States and the Navajo

Nation: one signed in 1849 and ratified by Congress in 1850 and the other signed and

ratified in 1868.[44]  The 1868 treaty acknowledges certain lands as the Navajo

Reservation.  It recognizes the Nation's right to exclude others from this land, and

implicitly recognizes that the Nation has a right to govern its own internal affairs.[45]

---

[40]*See, e.g.*, Indian Reorganization Act of 1934 ("IRA), Pub. L. No. 73-383, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §§ 461-479).  *Morton v. Mancari*, 417 U.S. 535, 542 (1974) (stating that the IRA was meant to "establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically").

[41]*Wheeler*, 435 U.S. at 322-23.

[42]*See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137 (1982) (discussing whether a tribe's power to tax derives solely from the tribe's power to exclude non-Indians from tribal lands).

[43]*Montana v. United States*, 450 U.S. 544, 565 (1981).

[44]*United States v. Wheeler*, 435 U.S. 313, 324 n.20 (1978).

[45]*Id.* at 324; *Lee* 358 U.S. at 221-22.

-16-

"[T]he reservation of certain lands to the Navajos 'was meant to establish the lands as within the exclusive sovereignty of the Navajos under general federal supervision.'" [46]

Congress has also passed legislation to improve the Nation's circumstances through the development of natural resources on the Nation's tribal lands.  In 1950 Congress passed the Navajo-Hopi Rehabilitation Act ("Rehabilitation Act") that provided money for infrastructure improvement projects, including surveys and studies of the Nation's coal resources.  The Rehabilitation Act also granted the Nation authority to enter into leases for certain projects with approval of the Secretary.[47]

### 4. Political Classification

As part of the federal government's historical relationship with Indian tribes and Congress's plenary power to legislate on matters related to Indian affairs, Congress has passed various pieces of legislation intended to benefit Indian tribes.  Even though these laws often single out Indian tribes for special treatment, the Supreme Court has consistently upheld them, reaffirming that Indian tribes possess a special status under the law, distinct from that held by non-Indians.[48]

In *Morton v. Mancari*, the Court discussed this special legal status and analyzed how it applies to hiring preferences.  In that case, a group of non-Indian employees of the Bureau of Indian Affairs ("BIA") challenged the BIA's hiring preference for Indian

---

[46]*Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 596 (1983) (quoting *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 175 (1973)).

[47]25 U.S.C. § § 631, 635.

[48]*See Mancari*, 417 U.S. at 555 (listing cases where the Court has upheld legislation that singles out Indians for special treatment).

applicants under the Due Process Clause of the Fifth Amendment, asserting that the hiring preference constituted unlawful discrimination on the basis of race.  The Court upheld the hiring preference.  It explained that the preference was not a racial preference, but rather a preference given to members of quasi-sovereign tribal entities.[49]  Thus, it was subject to rational basis review rather than strict scrutiny:  "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed."[50]  The Court concluded that the BIA preference was reasonable and rationally designed to further Indian self-government and thus was lawful.

While the employment preference in *Mancari* was a general preference for members of any Indian tribe and not a specific tribe, the reasoning applies to the tribe-specific preference in Peabody's IMLA leases.  As discussed above, each tribe is its own quasi-sovereign entity.  The federal government has a distinct relationship with each tribe and distinct trust obligations owed to each tribe.  Tribe-specific employment preferences in DOI-approved leases help discharge those trust obligations.  Their inclusion in the leases is for political reasons: to benefit the members of the tribe—a political entity—and to foster tribal self-government and self-sufficiency.  It is tribal membership, not status as an Indian, that is the touchstone.  Like the general Indian preference in *Mancari*, the tribe-specific preference included in the DOI-approved leases is a political classification.

---

[49]*Id.* at 553-54.

[50]*Id.* at 555.

Because the preference in Peabody's IMLA leases is a political classification and not a national origin classification, it should be found lawful as long as the inclusion of the preference is rationally tied to legitimate, nonracially based goals.  First, the preference furthers the goal of tribal self-sufficiency.[51]  Providing on-reservation jobs for the Nation's members is rationally connected to the goal of economic self-sufficiency.  Second, and similarly, the preference furthers the goal of economic development on tribal lands.[52]  Congress enacted the IMLA in part to help achieve the Indian Rehabilitation Act's goal of promoting tribal economic development by providing tribes a profitable source of revenue through extraction of tribal minerals. [53]  Providing mining employment opportunities to members of the Nation ensures that more of the revenue derived from the extraction of the tribe's resources is distributed to the tribe through its members who share an interest in the Nation's natural resources that are held in trust by the federal government.  Finally, the preference helps further the goal of self-governance.[54]  As explained above, the Nation has the right to exclude third parties from their trust lands.  That right to exclude includes the lesser power to condition entry.[55]  A DOI-approved lease that requires a private employer operating on tribal lands

---

[51]*See White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143 (1980) (explaining that there is a federal policy of promoting tribal self-sufficiency and economic development).

[52] *See id.*

[53]*United States v. Navajo Nation*, 537 U.S. 488, 511 n. 16 (2003).

[54]*Mancari,* 417 U.S. at 542 (stating that a purpose of the IRA was to promote greater tribal self-government).

[55]*Jicarilla Apache Tribe*, 455 U.S. at 144; *Babbitt Ford*, 710 F.2d at 592.

to prefer members of that tribe is one aspect of the right to condition entry and furthers

the Nation's sovereign right to govern affairs within its designated territory.

5. Indian Preference Exemption in Section 703(I)

EEOC urges the court to consider the Indian preference exemption in Section

703(I) of Title VII, and argues that because Congress exempted from Title VII only

general employment preferences in favor of all Indians, it did not intend to exempt tribe-

specific preferences.  The Indian preference exemption in § 703(I) states as follows:

> Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which preferential treatment is given to any individual because he is an Indian living on or near a reservation.[56]

EEOC interpreted the meaning and scope of this exception in a 1988 policy statement.

It concluded in that policy statement that the exemption demonstrated Congress's intent

to encourage employment opportunities to Indians generally, without allowing

discrimination among different Indian tribes.[57]  The Ninth Circuit agreed with this

interpretation of the 1988 policy statement in *Dawavendewa I*.[58]  As DOI points out,

however, the 1988 policy statement does not address the specific issue in this case;

namely, whether a tribe-specific hiring preference maintained by an employer

complying with the terms of a DOI-approved lease for the development of the tribe's

natural resources that are held in trust by the federal government is discrimination in the

---

[56]42 U.S.C. § 2000e-2(i).

[57]*Dawavendewa I*, 154 F.3d at 1121 (discussing the 1988 policy statement).

[58]*Id.* at 1121-24.

first place.  As discussed above, the court concludes that such a preference is not

unlawful national origin discrimination but a political classification and thus not within

the scope of Title VII.   While it is likely that Congress intended to only exempt Indian

employment preferences in general and not tribe-specific preferences from Title VII in

situations where an employer discriminates against members of a particular tribe

without oversight or approval by the federal government, that is not the situation

presented in this case.

Furthermore, the court cannot conclude that by only including an exemption in

Title VII for Indian employment preferences in general, Congress implicitly intended to

prohibit every type of tribe-specific employment preference.  Implied repeals are

disfavored. [59]   The DOI's practice of including tribe-specific employment preferences in

mining leases dates back to before the passage of Title VII, and, as discussed above,

such preferences are a part of the federal government's attempt to meet its various

obligations towards the Nation and to foster tribal self-sufficiency, self-governance, and

economic development.  In addition, the Nation has located and identified at least 326

DOI-approved business leases on tribal lands within the last decade that include a tribe-

specific employment preference.  Elimination of this longstanding and ubiquitous DOI

practice would require a far more explicit showing of Congress's intention to do so than

is reflected in § 703(I).

_____

[59]*Mancari*, 417 U.S. at 549-50.

-21-

**V.  CONCLUSION**

For the reasons above, DOI's Third-Party Defendants' Motion for Summary Judgment as to Peabody Western Coal Company's Third-Party Complaint at docket 243 is hereby **GRANTED,** and the Nation's Renewed Motion to Dismiss, or in the alternative, Motion for Summary Judgment, on the Merits of Navajo Tribal Preference in Employment is hereby **GRANTED**.  The Clerk of Court will please enter judgment dismissing plaintiff's claims with prejudice and dismissing all third-party claims and counterclaims without prejudice.

DATED this 17th day of October 2012.


/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE